## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

RICHARD C. SKIPPER,                      )
*as Personal Representative of the Estate of*  )
*George W. Skipper, III, and as Personal*  )
*Representative of the Estate of*         )
*Helen O'Melia Skipper*,                  )
                                          )
       Plaintiff,                        )
                                          )
vs.                                       )          CIVIL ACTION NO. 1:22-cv-272-TFM-B
                                          )
UNITED STATES OF AMERICA,                 )
                                          )
       Defendant.                        )

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is the *United States' Motion to Dismiss Complaint* (Doc. 12, filed September 26, 2022) and memorandum of law in support (Doc. 12-1, filed September 26, 2022). Defendant United States of America motions the Court, pursuant to Fed. R. Civ. P. 12(b)(6), dismiss the complaint that was filed by Plaintiff Richard C. Skipper, as personal representative of the estate of George W. Skipper, III, and as personal representative of the estate of Helen O'Melia Skipper. *Id.* Having considered the motion and memorandum of law in support, response, reply, and relevant law, the Court finds the motion to dismiss is due to be **GRANTED**.

## I.      JURISDICTION AND VENUE

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1346 (suit against the United States to recover internal-revenue tax alleged to have been erroneously or illegally assessed or collected).

The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. The district court has personal jurisdiction over the claims in this action because

the events that gave rise to this action are alleged to have occurred within this district.  *See Consol.*

*Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises

out of a party's activities in the forum that are related to the cause of action alleged in the

complaint. . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts

with the forum that are unrelated to the cause of action being litigated.  The due process

requirements for general personal jurisdiction are more stringent than for specific personal

jurisdiction, and require a showing of continuous and systematic general business contacts between

the defendant and the forum state.").  Venue is proper in this Court pursuant to 28 U.S.C. §

1402(a)(1) because the plaintiff resides in this judicial district.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Background[1]

On October 8, 2012, George Skipper filed for personal bankruptcy.  Doc. 15 at 2.  George

Skipper and Helen Skipper (collectively, "the Skippers") filed a joint tax return for the period from

January 1, 2012, through October 7, 2012, and self-assessed a tax liability in the amount of

$1,007,369 and reported total payments in the amount of $1,497,800, which resulted in an

overpayment of $490,431.  *Id.*  Said tax return ("the processed return") was timely filed and

processed by the Internal Revenue Service ("the IRS").  *Id.*  In conjunction with the processed

return, the Skippers filed a second joint tax return and, due to George Skipper's bankruptcy filing,

reported only Helen Skipper's income for the period from October 8, 2012, to December 31, 2012.

*Id.* at 3.  Although the second joint tax return for 2012 was timely filed, the IRS failed to process

---

[1] The facts presented in the "Factual Background" section of this Memorandum Opinion and Order
are based on the factual allegations that are contained in the complaint, which the Court must
assume are true for a motion to dismiss pursuant to Fed. R. Civ. P 12(b)(6).  *See, e.g., United States
v. Gaubert*, 499 U.S. 315, 327, 111 S. Ct. 1267, 1276, 113 L. Ed. 2d 335 (1991).

the return ("the unprocessed return"). *Id.* at 3. The unprocessed return self-assessed a tax liability of $356,318, and reported total payments of $875,000, which resulted in an additional overpayment of $518,682. *Id.* Collectively, the Skippers self-assessed $1,363,687 in taxes and made $2,372,800 in tax payments, which resulted in a total overpayment for the 2012 tax year in the amount of $1,009,113 and included the processed return overpayments of $490,431 plus the unprocessed return overpayment of $518,682. *Id.*

The total overpayment actually credited to the Skippers' 2012 account was increased by $100,000, which resulted in a total overpayment for the 2012 tax year in the amount of $1,109,113. *Id.* In lieu of a refund, the Skippers elected to apply the 2012 overpayment toward their 2013 tax year ("the 2012 rollover amount"). *Id.*

For the 2013 tax year, the Skippers timely filed a joint tax return ("the 2013 return"). *Id.* The 2013 return self-assessed a tax liability of $2,436,861 and reported total payments in the amount of $3,114,113, which consisted of the 2012 rollover amount, a $750,000 tax payment by the Skippers during the 2013 tax year, and an additional $1,255,000 that was paid by the Skippers in connection with a filing extension, which resulted in a tax overpayment in the amount of $677,252. *Id.* at 3-4. Like the Skippers' 2012 return, they elected to apply this $677,252 overpayment from 2013 to their joint return for the 2014 tax year ("the 2013 rollover amount"). *Id.* at 4. Thus, for both the 2012 and 2013 tax years, the Skippers timely filed their returns and fully paid all self-assessed tax liabilities. *Id.* The IRS did not further assess taxes for the Skippers for the 2012 and 2013 tax years. *Id.*

Once the processed return and the 2013 return were fully processed and the 2013 rollover amount was applied toward the 2014 tax year, the Skippers' 2012 and 2013 accounts were updated by the IRS to show a zero balance. *Id.*

Despite the Skippers' timely filing, the IRS did not account for the $356,318 self-assessed tax liability that was reported on the unprocessed return and the Skippers' timely payment thereof. *Id.* Because the IRS's system did not recognize the additional $356,318 that was reported as a tax liability on the unprocessed return, the Skippers' total overpayment for the 2012 tax year was increased by the same amount, $356,318. *Id.* This additional overpayment was also applied by the IRS toward the Skippers' 2013 tax year, which created a credit balance in the Skippers' previously zeroed-out 2013 tax account. *Id.*

As shown on the Skippers' 2013 account transcript, the IRS's system was unable to reconcile the discrepancy that was caused by the appearance of the new credit balance and generated a refund check on November 7, 2013, in the amount of $355,836.91, which was comprised of the $356,318 credit amount less a previously unpaid $481.09 penalty ("the erroneous refunds"). *Id.*

After the Skippers received the erroneous refund, they immediately notified the IRS the erroneous refund was issued, informed the IRS the unprocessed return properly showed a matching tax liability, and returned the erroneous refund to the IRS. *Id.* at 5. The IRS did not acknowledge the information that was provided by the Skippers or reverse the erroneous refund and credit the Skippers' prior payment of the $356,318 self-assessed tax liability that was reported in the unprocessed return. *Id.*

A cycle began to repeat itself where the IRS would issue the erroneous refund to the Skippers and they would then return the erroneous refund to the IRS. *Id.* This back-and-forth with the IRS continued for approximately three (3) years. *Id.* During such time, the erroneous refund continued to accrue interest, eventually growing to $399,191.90 as of September 29, 2017. *Id.*

After numerous phone conferences with the IRS failed to resolve the issue, the Skippers'

accountant sent a letter to the IRS that was dated October 16, 2017, to clarify the issues and timeline that are related to the erroneous refund and the unprocessed return, and return the erroneous refund check to the IRS. *Id.* Despite the Skippers' efforts to return the erroneous refund, the IRS again issued the erroneous refund to them on August 17, 2018, which had appreciated to $415,015.80. *Id.*

The Skippers ultimately decided to deposit the erroneous refund check in September 2018. *Id.* Almost immediately after the Skippers deposited the erroneous refund check, the IRS changed its position, admitted the erroneous refund was issued in error, and demanded its return. *Id.* The Skippers, however, refused to return the erroneous refund. *Id.*

In letters that are dated April 25, 2019, and June 12, 2019, the IRS admitted its mistake when it applied a credit to the Skippers' 2013 tax account, the erroneous refund should not have been issued, and acknowledged the Skippers' prior attempts to return the erroneous refund. *Id.* at 6. The amount of the erroneous refund had appreciated to $433,706.48. *Id.*

Unable to resolve the dispute over the erroneous refund, the Skippers filed their 2019 joint tax return, which reported an overpayment of tax in the amount of $427,772 ("the 2019 overpayments") and requested a refund from the IRS. *Id.* As shown in a letter from the IRS that is dated August 11, 2020, the IRS applied the 2019 overpayment to the Skippers' 2013 tax year in an effort to recover the erroneous refund despite the facts that there were neither unpaid outstanding assessments nor a reassessment of any additional tax for 2013. *Id.* The IRS took the position that the issuance of the erroneous refund resulted in an "unpaid assessment" for the 2013 tax year for which administrative offset is an appropriate collection action. *Id.*

On February 4, 2021, the Skippers' tax counsel submitted a Form 843 Claim for Refund and Request for Abatement in which he requested the IRS to refund the 2019 overpayment to the

Skippers and, as a result, commenced the six (6) month statutory period that is required to file a petition in the United States District Court. *Id.* at 8.

The IRS has neither processed nor responded to the Skippers' request for a refund of the 2019 overpayment within the six (6) month statutory period. *Id.*

On May 4, 2020, the Last Will and Testament of Helen Skipper was admitted to the Probate Court of Clarke County, Alabama, and Plaintiff Richard C. Skipper ("Plaintiff or "Skipper") was appointed as personal representative of the estate on February 15, 2022. *Id.* at 1. On February 14, 2022, the Last Will and Testament of George Skipper was admitted to the Probate Court of Clarke County, Alabama, and Plaintiff was appointed as Personal Representative of the Estate on February 15, 2022. *Id.* at 1-2.

## B.   PROCEDURAL BACKGROUND

On July 7, 2022, Plaintiff originally filed his complaint in this Court in which he brings one claim against the United States to recover the Skippers' overpayment to the IRS for the 2019 tax year, pursuant to 26 U.S.C. § 7422. Doc. 1. Plaintiff concurrently filed a motion for leave to seal the complaint and its attached exhibits, which was denied, and the Court ordered him to file a copy of his complaint and any exhibits that were redacted, as required by Fed. R. Civ. P. 5.2 , and wished to attach to his complaint. Docs. 2, 14. Plaintiff filed his appropriately redacted complaint and supporting exhibits on October 7, 2022, and said complaint is the operative pleading in this matter. Doc. 15.

On September 26, 2022, the United States filed the instant motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), and memorandum in support. Docs. 12, 12-1. Plaintiff timely filed his response and the United States its reply. Docs. 18, 19. The Court finds oral argument unnecessary to resolve the issues that are raised in the motion to dismiss, and therefore, the motion is ripe for

adjudication.

## III.    STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint on the basis that the plaintiff has failed to state a claim upon which relief may be granted.  *See* FED. R. CIV. P. 12(b)(6).  To survive a motion to dismiss, a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  [*Twombly*, 550 U.S.] at 570, 127 S. Ct. [at] 1955.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.* at 556, 127 S. Ct. [at] 1955.").  Since a Fed. R. Civ. P. 12(b)(6) motion questions the legal sufficiency of a complaint, in assessing the merits of the motion, the court must assume that all the factual allegations set forth in the complaint are true.  *See, e.g., Gaubert*, 499 U.S. at 327, 111 S. Ct. at 1276; *Powell v. Lennon*, 914 F.2d 1459, 1463 (11th Cir. 1990); *but see also Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1955) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Moreover, all factual allegations shall be construed in the light most favorable to the plaintiff.  *See, e.g., Brower v. County of Inyo*, 489 U.S. 593, 598, 109 S. Ct. 1378, 1382, 103 L. Ed. 2d 628 (1989).  Obviously, therefore, a district court may not resolve factual disputes when adjudicating a motion to dismiss.  *Page v. Postmaster Gen. and Chief Exec. Officer of the U.S. Postal Serv.*, 493 F. App'x 994, 995

(11th Cir. 2012) (citing, among other cases, *Lawrence,* 919 F.2d at 1529, for the proposition that, under Fed. R. Civ. P. 12(b)(6), the existence of disputed material facts precludes a district court from granting a motion to dismiss).  "'When considering a motion to dismiss . . . the court limits its consideration to the pleadings and all exhibits attached thereto.'"  *Thaeter v. Palm Beach Cnty. Sheriff's Office,* 449 F.3d 1342, 1352 (11th Cir. 2006) (quoting *Grossman v. Nationsbank, N.A.,* 225 F.3d 1228, 1231 (11th Cir. 2000) (per curiam)); *see also Reese v. Ellis, Painter, Ratterree & Adams, LLP,* 678 F.3d 1211, 1215-16 (11th Cir. 2012) ("Because the Ellis law firm's dunning letter and enclosed documents were attached to the Reeses' complaint as an exhibit, we treat them as part of the complaint for [Fed. R. Civ. P.] 12(b)(6) purposes.").

## IV.    DISCUSSION AND ANALYSIS

The United States argues the offset was timely and an appropriate method to recover the erroneous refund because it was a nonrebate erroneous refund, and, therefore, the IRS may either solicit a voluntary repayment of the erroneous refund, institute an erroneous refund suit pursuant to 26 U.S.C. § 7405, or exercise the common-law right of a creditor to offset money it owes to a debtor against debts due to it by the same debtor.  Doc. 12-1 at 4-8.  The United States argues the erroneous refund was a nonrebate erroneous refund because it was issued as a result of a computer mistake when the Skippers were not due a refund and, contrary to the allegations in the complaint, the IRS never took the position that the refund was an unpaid assessment, which is evidenced by communications from the IRS to the Skippers that are attached to the complaint.  *Id.* at 4-7.  The United States argues the offset was timely because it was performed within two (2) years from when the IRS issued the erroneous refund.  *Id.* at 7-8.

In response, Plaintiff argues the United States' arguments that nonrebate erroneous refunds cannot be assessed and/or collected under the administrative collection procedures, pursuant to the

United States Code, and the IRS is permitted to collect the refund under the common law right of offset, is based on a misreading of the leading case for the topic, *O'Bryant v. United States*, 49 F.3d 340 (7th Cir. 1995), which was followed by *Bilzerian v. USA*, 86 F.3d 1067 (11th Cir. 1996). Doc. 18 at 6-13. Specifically, Plaintiff argues *O'Bryant* stands for the proposition that a nonrebate erroneous refund cannot revive the original, previously paid tax assessment from which it arose and the erroneously refunded amount must first be reassessed and collected within the statutory time limits or otherwise recovered through an appropriate lawsuit. *Id.* Plaintiff also disputes whether the erroneous refund is, as Plaintiff describes, a "non-tax debt." Doc. 18 at 7-8.

The "Statutory Background" section of *O'Bryant* is an instructive preface to analyze the issues presented in this matter:

> Typically, when the IRS receives a tax return it evaluates the return for accuracy. If it finds the return satisfactory, it enters an assessment for the amount of tax that the taxpayer has calculated to be owing. If the IRS disagrees with the taxpayer's determination of his tax liability it can enter a different assessment, but only after it issues a notice of deficiency to the taxpayer and gives him 90 days to challenge its calculations in the Tax Court. The IRS has three years from the date the refund is filed to make an assessment of liability. 26 U.S.C. §§ 6201, 6212, 6213.
>
> Once it makes an assessment the IRS generally has 60 days to issue a notice and demand for payment to the taxpayer, and ten years to collect the assessed amount. 26 U.S.C. §§ 6303, 6502(a)(1). Collection may be made through administrative methods (including federal liens, summonses, and levies) or judicial methods (suits to foreclose liens or reduce assessments to judgment). 26 U.S.C. §§ 6321-6326, 7403. If the IRS discovers that "any assessment is imperfect or incomplete in any material respect," it may correct the problem by making a supplemental assessment within three years of the filing of the return. 26 U.S.C. § 6204.
>
> Occasionally, the IRS sends a taxpayer a refund check. Since 1944 the Tax Code has recognized two types of refunds: rebate refunds and nonrebate refunds. Rebate refunds are issued on the basis of some substantive recalculation of the tax owed, e.g., if the tax due under the Code was less than the amount shown on the return and previously assessed. Nonrebate refunds are sent to the taxpayer not because the IRS determines that the tax paid is not owing but because of mistakes, typically clerical or computer errors. The rebate/nonrebate distinction arises from the definition of "deficiency" contained in 26 U.S.C. § 6211; rebate refunds can be included in deficiency calculations, while nonrebate refunds cannot. Periodically,

of course, erroneous refunds (both rebate and nonrebate) are issued.  When that happens, the IRS will usually attempt to recover the money.  The methods available for doing so depend in part on whether the refund falls into the rebate or nonrebate category.

. . .

There are two ways in which the IRS can recover an erroneous payment to a taxpayer.  It can either file suit under § 7405, the erroneous refund suit provision, or pursue the post-assessment collection procedures outlined above (§ 6303 notice and demand, followed by judicial and/or administrative action).

*O'Bryant*, 49 F.3d at 342-43 (footnotes omitted).

Plaintiff alleges the Skippers' timely payment of their $356,318 self-assessed tax liability that was reported on the unprocessed return was not properly applied by the IRS and was applied to their 2013 tax year, which created a credit balance in their favor for 2013 that the IRS attempted to refund to them, plus accrued interest, multiple times over several years, the last of which occurred on August 17, 2018.  Doc. 15 at 4-5.  Based on Plaintiff's allegations, the refund at issue was not issued as the result of a substantive recalculation of the Skippers' tax owed but was issued, and reissued, as a result of the IRS's error, which would make it a nonrebate erroneous refund.  Since the Court has determined the type of refund at issue, it must determine whether the IRS could recover the nonrebate erroneous refund through the common-law right of offset.

The parties cite extensively to *O'Bryant* to support each of their arguments and disagree as to its meaning, and neither party has cited to binding precedent that addresses the specific issue that is presented in this case.  The United States Court of Appeals for the Federal Circuit summarized *O'Bryant* as follows:

In *O'Bryant*, the taxpayers paid their tax and interest liability in advance, which amounts were then assessed.  The [IRS] later erroneously sent the taxpayers a refund check.  Without reassessing the tax, the [IRS] then instituted collection activities and recovered a portion of the erroneous refund.  The taxpayers sued to quiet title and recover the monies they claimed were unlawfully taken by the government.  The Seventh Circuit noted that the refund taxpayers received was a

nonrebate refund.  "Nonrebate refunds are sent to the taxpayer not because the IRS determines that the tax paid is not owing but because of mistakes, typically clerical or computer errors."  *O'Bryant*, 49 F.3d at 342.  The court stated that there is a fundamental difference between taxpayers' liability for tax and their obligation, if any, to return a refund paid by mistake:

> [The government's proposed] approach would overlook the fundamental difference in character between the money that the O'Bryants now possess (a refund caused by the IRS' error) and the money they originally owed the IRS (their tax liability).  The money the O'Bryants have now is not the money that the IRS' original assessment contemplated, since that amount was already paid.  Rather, it is a payment the IRS accidentally sent them.  They owe it to the government because they have been unjustly enriched by it, not because they have not paid their taxes.

*Id.* at 346.  The court held that because the money the taxpayer received was not a part of the taxpaying transaction, the [IRS] could not recover the funds through post-assessment procedures.  *Id.*

*Pac. Gas & Elec. Co. v. United States*, 417 F.3d 1375, 1382 (Fed. Cir. 2005) (hereinafter, *PG&E*).

      *O'Bryant* does not answer the Court's specific inquiry as to whether the IRS is allowed to recover a nonrebate erroneous refund through offset but addresses Plaintiff's argument that the erroneously refunded amount must first be reassessed and collected within the statutory time limits, which such a refund cannot.  However, the Court finds the Federal Circuit's decision in *PG&E* is more closely related to the inquiry at hand to guide the Court's decision.

      The issue in *PG&E* that the Federal Circuit confronted was whether the IRS was entitled to offset an erroneous refund of statutory interest that was refunded to the taxpayer against amounts that were due to be refunded for the same tax year when the government could not have maintained a suit to recover the statutory interest since the statute of limitations had expired.  *Id.* at 1378.  In the Federal Circuit's reasoning, it distinguished between assessable quantities that are a part of a taxpayer's liabilities, such as a tax deficiency, tax penalty, and deficiency interest, and nonassessable quantities, which in that case was statutory interest.  *Id.* at 1381.  The Federal Circuit

noted such quantities are "treated differently by the Internal Revenue Code," and prior Federal Circuit case law noted the distinction between them. *Id.* at 1382 (citing *Alexander Proudfoot Co. v. United States*, 454 F.2d 1379, (Ct. Cl. 1972); *Fisher v. United States*, 80 F.3d 1576 (Fed. Cir. 1996)). The Federal Circuit used *O'Bryant* as such an example of a case in which another court "treat[ed] tax monies differently based on the nature or generation of the funds." *Id.* The Federal Circuit ultimately held "the [IRS]'s ability to offset erroneously paid statutory interest against a taxpayer's refund claim in the same tax year is subject to the same statute of limitations that applies to suits by the United States to recover erroneous refunds of taxes or erroneous payments of interest on refunds." *Id.* at 1384 (citing 26 U.S.C. §§ 6532(b), 7405). The Federal Circuit identified "there is no statute governing the time limit for when such an offset may be made," but "there is a statute expressly limiting when the government can sue to recover erroneous refunds under 26 U.S.C. § 7405," which is within two (2) years of the erroneous refund. *Id.* at 1384.

Given the Federal Circuit's holding in *PG&E* and the fact that nonrebate erroneous refunds, like statutory interest, are not a part of a taxpayer's liabilities, the Court finds it logical the IRS is able to offset nonrebate erroneous refunds within the statute of limitations that applies for the government to recover erroneous refunds under 26 U.S.C. § 7405.

Here, the nonrebate erroneous refund was issued on August 17, 2018, the Skippers deposited the refund on September 17, 2018, and the IRS offset the refund against the Skippers' 2019 tax overpayment on August 11, 2020, which was within the applicable statute of limitations. Therefore, Plaintiff fails to show he is entitled to the relief he requests, and Defendant's motion to dismiss is **GRANTED**.

## V.     CONCLUSION

Accordingly, the United States' motion to dismiss (Doc. 12) is **GRANTED** and Plaintiff's single claim in his complaint is **DISMISSED WITH PREJUDICE**.

**DONE** and **ORDERED** this 19th day of July 2023.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE